47 P.3d 327 (2002)
The PEOPLE of the State of Colorado, in the Interest of J.A.U., a child, Petitioner.
v.
R.L.C., Respondent.
No. 01SC530.
Supreme Court of Colorado, En Banc.
May 28, 2002.
*328 William A. Tuthill, III, Acting Jefferson County Attorney, Ingrid Holmes, Assistant County Attorney, Kathleen Curley, Assistant County Attorney, Golden, Colorado, Attorneys for Petitioner.
No Appearance by or on behalf of Respondent.
Justice BENDER delivered the Opinion of the Court.

I. INTRODUCTION
This case requires us to decide whether a man, R.L.C., who has previously admitted paternity and been adjudicated the father of a child may, eleven years after the judgment has entered, obtain genetic tests that he believes will assist him in challenging that judgment of paternity. We conclude that he may not.
The trial court denied R.L.C.'s motion for genetic tests, reasoning that Colorado's statutory scheme does not provide for genetic tests after a final judgment of paternity has entered. The court of appeals reversed in In re J.A.U., 33 P.3d 1237, 1238-39 (Colo.App. 2001), holding that: (1) Colorado statute mandates that genetic tests be conducted upon the motion of the court or any interested party; (2) R.L.C.'s motion for genetic testing essentially alleged that the judgment of paternity was based on a mistake of material fact and thus placed the original judgment of paternity at issue; and (3) that there exists no time limit to when a challenge to a legal determination of paternity may be brought pursuant to section 19-4-105(2)(c), 6 C.R.S. (2001).
With this case, we announce two holdings. First, we hold that a challenge to a paternity judgment on the basis of material mistake of fact, pursuant to section 19-4-105(2)(c), must be brought within the six-month time limit of Colorado Rule of Civil Procedure 60(b). In this case, assuming that R.L.C.'s motion alleges that the original judgment was based on a mistake of material fact and that this allegation is sufficient to constitute a motion to vacate the judgment pursuant to C.R.C.P. 60(b), R.L.C.'s motion was not brought within relevant time limits and therefore must be denied.
Second, we hold that section 19-4-112, 6 C.R.S. (2001), the provision of the Children's Code governing genetic testing during paternity adjudications, does not provide for such testing after a legal judgment of paternity has entered. We base our holding on both the language of the statute and the State's interest in safeguarding the welfare of children.
Hence, we reverse the judgment of the court of appeals and remand this case to it for return to the district court for further proceedings consistent with this opinion.

II. FACTS AND PROCEEDINGS BELOW
L.E.R. and R.L.C., both Colorado residents, were involved in an intimate relationship *329 during late 1987 and early 1988. L.E.R. became pregnant. In September of 1988, before the child was born, L.E.R. sought an adjudication of paternity and a child support order.
R.L.C., appearing pro se, stipulated to paternity at a hearing held in the Jefferson County District Court in October of 1988. R.L.C.'s acknowledgment of his relationship to the child occurred without any request for blood tests, though he was entitled to demand such tests under Colorado law.
The child, J.A.U., was born in November of 1988. Two months later, the trial court entered a judgment of paternity and ordered R.L.C. to pay child support.
R.L.C. never met J.A.U. However, approximately eleven years after the judgment of paternity was entered, L.E.R. sent J.A.U.'s picture to R.L.C. He examined this picture and began to suspect that he was not the biological father of J.A.U.
He, then, eleven years and five months after the judgment entered, in May of 2000, filed a motion for genetic testing, stating that he "desires the certainty of genetic testing" because:
In viewing the photograph [of J.A.U.], Respondent noticed several dissimilarities in facial features which has caused Respondent to seriously doubt his paternity in this case. Respondent now believes his decision to admit paternity was based upon an erroneous assumption on his part, and that he, in fact, is not the father of the minor child.
R.L.C.'s request was opposed by the Jefferson County Department of Social Services, who had standing because of its role as the child support enforcement authority.
The trial court denied R.L.C.'s motion, reasoning that section 19-4-112, which governs genetic testing in paternity cases, requires such testing only when paternity is at issue. Because paternity had already been litigated and finally adjudicated in this case, and because R.L.C. had not attacked that judgment, the trial court concluded that "under the circumstances of this case the law does not provide for or permit genetic testing."
The court of appeals reversed in a published opinion, relying on its construction of two provisions of the Colorado's Children's Code. In re J.A.U., 33 P.3d at 1238-39. First, the court noted that the language of section 19-4-112, which governs genetic testing in paternity cases, makes such tests mandatory upon the motion of the court or any interested party. Id. at 1238.
Next, presumably because it would be meaningless to permit post-adjudication genetic tests if the results of such tests could not be used to challenge existing judgments, the court went on to consider whether R.L.C. could challenge the paternity judgment involved in this case.[1] The court turned to section 19-4-105(2)(c), which permits challenges to judgments of paternity on the basis of fraud, duress, or mistake of material fact. Id. This statute does not specify a time limit within which such challenges must be brought. From this, the court of appeals reasoned that no time limit applies when an adjudicated father wishes to challenge a judgment on the basis of one of those three grounds. Id. Implicit in the court of appeals' holding was the conclusion that the time limits of C.R.C.P. 60(b), which governs motions to amend or vacate civil judgments, do not apply to paternity judgments.
Because of the court's interpretation of R.L.C.'s motion for genetic testing, which it read to allege that the judgment was based on a material mistake of fact, the court concluded that the motion placed the original judgment at issue and entitled R.L.C. to the genetic tests that he sought. Id. at 1239.
We granted certiorari to resolve the questions of: (1) whether the time limits of C.R.C.P. 60(b) apply when a legal finding of paternity is challenged on the basis of mistake of material fact; and (2) whether section 19-4-112, the statute governing genetic testing *330 in paternity cases, permits such tests to be performed even after a legal adjudication of paternity has been entered.[2],[3]

III. ANALYSIS
R.L.C. argues that, because of the "clear legislative and judicial preference in favor of accurate determinations of biological parentage," he must be permitted to obtain DNA tests to determine whether he is the biological father of J.A.U. He suggests that Colorado's statutory scheme "contemplates placing the biological parentage of a child at issue [even] subsequent to an adjudication of paternity." We consider first whether the time limits of C.R.C.P. 60(b) are applicable to challenges to paternity judgments, before turning to the question of whether an adjudicated father is entitled to genetic tests to confirm his biological relationship to the child after the judgment of paternity has entered.[4] We conclude that C.R.C.P. 60(b) does apply to challenges to paternity judgments on the basis of mistake and that Colorado statutes do not provide for post-adjudication genetic testing.

A. The Time Limits of C.R.C.P. 60(b) Apply to Challenges to Paternity Judgments on the Basis of Mistake
We begin our analysis by discussing the importance of finality of judgments, both to the legal system as a whole and to individual judicial determinations.
Once a final judgment has entered and the time for review has passed, the judgment is generally conclusive between the parties. See, e.g., E.J.R. v. Dist. Court, 892 P.2d 222, 226 (Colo.1995) ("We have long recognized that a definite public interest exists in the assured final adjudication of controversies and conclusiveness of judgments."). A court's power to modify or vacate a final judgment is limited, even if aspects of that final judgment are erroneous. See, e.g., People v. Caro, 753 P.2d 196, 200 (Colo.1988).
If judgments could easily be set aside, public confidence in the courts would be undermined. As judges and legal scholars have long recognized, protecting the finality of judgments promotes stability, certainty, and consistency in the law, and enhances the credibility of the judicial system:
That the formal pronouncements of legal tribunals upon causes submitted to them should enjoy every possible degree of finality and conclusiveness would seem to be a necessary predicate to the proper functioning of the courts themselves. To permit their decisions to be evaded or disregarded *331 for insufficient cause or in modes not sanctioned by law would tend to disrupt the administration of justice and bring courts into disrepute. Public policy requires that. . . judgments, as solemn records upon which valuable rights rest, should not lightly be disturbed or overthrown.
1 A.C. Freeman, Freeman on Judgments § 305, at 602-03 (5th ed. 1925); see also, e.g., Davidson v. McClellan, 16 P.3d 233, 236-37 (Colo.2001); Knapp v. Knapp, 24 Ohio St.3d 141, 493 N.E.2d 1353, 1356 (1986) ("Finality requires that there be some end to every lawsuit, thus producing certainty in the law and public confidence in the system's ability to resolve disputes.").
Individual parties who rely on existing judgments could be irreparably damaged by subsequent modifications to those judgments. To protect the interests of those parties, we have recognized that there must ordinarily be an ultimate stopping point at which a judgment is considered conclusive and unchangeable. Davidson, 16 P.3d at 236 ("It is essential, for practical reasons as well as for fundamental fairness, that there be a point at which litigation reaches a conclusion and that parties be permitted to rely on the outcome."); see also, e.g., Baldwin v. Iowa State Traveling Men's Ass'n, 283 U.S. 522, 525, 51 S.Ct. 517, 75 L.Ed. 1244 (1931) ("Public policy dictates that there be an end of litigation; that those who have contested an issue shall be bound by the result of the contest, and that matters once tried shall be considered forever settled as between the parties."); Tandra S. v. Tyrone W., 336 Md. 303, 648 A.2d 439, 448 (1994) ("[T]he policy of finality serves an important purpose  the parties understand their respective rights and need have no concern about future developments changing their rights.").
Occasionally, there are circumstances in which the State's interest in finality must give way to overriding concerns for truth and equity. Davidson, 16 P.3d at 237. Our society will not always permit blatantly erroneous or inequitable judgments to stand solely to promote interests in finality:
Litigants, of course, must be provided with some remedy to gain relief from an erroneous or unwarranted judgment. And in recognition of such necessity, the law has established appropriate proceedings to which a judgment party may always resort when he deems himself wronged by the court's decision.
1 Freeman, supra, § 305, at 603.
Thus, rules have developed to govern when a judgment may be vacated or amended. Once a valid judgment is entered, the only means by which the trial court may thereafter alter, amend or vacate the judgments is by appropriate motion under either C.R.C.P. 59 or 60.[5],[6]See, e.g., Caro, 753 P.2d at 200.
Relevant to this case, C.R.C.P. 60(b), which balances the "preferred rule of finality of judgments" and the need to provide relief in the interests of justice in exceptional cases, defines when a court can redress substantive errors in a final judgment. Southeastern Colo. Water Conservancy Dist. v. O'Neill, 817 P.2d 500, 505 (Colo.1991); see also State Farm Mut. Auto. Ins. Co. v. McMillan, 925 P.2d 785, 790 (Colo.1996); 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2851, at 227 (2d ed. 1995).
C.R.C.P. 60(b) provides that a court may relieve a party from a final judgment for any of a specified list of reasons, including, most relevantly here, "[m]istake, inadvertence, surprise, or excusable neglect."[7] Strict time *332 limits apply, however. Thus, a motion to set aside a judgment on the basis of mistake must be made "within a reasonable time, . . . not more than six months after the judgment. . . was entered." C.R.C.P. 60(b). Thus, any challenge based on mistake is absolutely barred after six months have passed from the date of judgment. The question presented by this case is whether that six-month time bar applies to paternity judgments.[8]
Article 4 of Title 19, the title known as the "Children's Code," is Colorado's version of the Uniform Parentage Act. It governs all Colorado paternity proceedings. Section 19-4-105(2)(c) provides that a "legal finding of paternity may be challenged in court only on the basis of fraud, duress, or mistake of material fact, with the burden of proof upon the challenger." Based on the fact that this statute does not specifically articulate a time limit within which such a challenge may be made, the court of appeals concluded that no time limit applied.
All proceedings conducted pursuant to the Colorado Children's Code, including paternity proceedings, are governed by the Colorado Rules of Juvenile Procedure. § 19-1-106(1), 6 C.R.S. (2001). Unfortunately, the Colorado Rules of Juvenile Procedure are silent as to when a judgment rendered under the provisions of the Children's Code may be modified or vacated. Some guidance is provided, however. Rule 1 states, "Proceedings are civil in nature and where not governed by these rules or the procedures set forth in Title 19 . . . shall be conducted in accordance with the Colorado Rules of Civil Procedure, except as otherwise provided by statute or these rules." This means that unless there is something in Title 19 that would preclude application of the Colorado Rules of Civil Procedure to paternity proceedings, those rules, including C.R.C.P. 60(b), apply.
We find nothing in the text of the Children's Code that suggests that the time limits of C.R.C.P. 60(b) do not apply to it. Section 19-4-105(2)(c) arguably may serve to limit the types of challenges that may be made to paternity judgments.[9] Nowhere, however, does section 19-4-105(2)(c) indicate that the legislature intended to expand the ability of parties to challenge paternity judgments beyond the boundaries provided by C.R.C.P. 60(b), so that challenges to paternity judgments can be brought at any time.
Neither section 19-4-119(1)(a), 6 C.R.S. (2001), nor section 19-4-108, 6 C.R.S. (2001), support the result R.L.C. seeks. Section 19-4-119(1)(a) provides the court with continuing jurisdiction "to modify or revoke a judgment or order . . . [f]or future education or support." It does not vest the court with continuing jurisdiction to modify or vacate paternity judgments. Section 19-4-108 provides that an "action to determine the existence of the father and child relationship may be brought at any time prior to the child's eighteenth birthday." The question in this case is not when a paternity action may be brought, but when an existing paternity judgment may be set aside.
A rule permitting unlimited challenges would be inconsistent with the public policy in favor of encouraging and respecting the finality of judgments. The policy interests that generally support the need for final judgments, discussed above, are particularly applicable to paternity judgments. The child's relationship with her parent, as well as her financial and psychological stability, are all threatened if an adjudicated father *333 can subsequently challenge the relationship in court. With so much hanging in the balance, courts must be extremely cautious about setting aside or altering adjudications of paternity, particularly when such judgments have existed unchallenged for an extended period of time.
We have previously recognized that, "[b]ecause a paternity action significantly impacts a child, concern for her welfare should be paramount at every stage of the proceedings." N.A.H. v. S.L.S., 9 P.3d 354, 364 (Colo.2000) (also stating that "[t]he outcome of a paternity action irrevocably alters a child's current family situation and her future"). Thus, we held that paternity determinations must take into account the best interests of the child. Id.; see also 1 Nina M. Vitek, Disputed Paternity Proceedings § 1.07, at 1-91 (2001) ("Courts now hold that the chief purpose of the paternity proceeding is to secure the health, welfare, and happiness of the child.").
Similarly, the child's interests must also be considered when deciding whether to permit a legal father to reopen a judgment of paternity. We are not persuaded that it is in the best interests of a child to permit an existing parent-child relationship to be subjected to endless question and challenge.
Thus, we hold that any challenge to a paternity judgment on the basis of mistake of material fact must be brought within the six-month time limit set forth in C.R.C.P. 60(b). We acknowledge that the results of this holding may sometimes, arguably, seem harsh or unfair. However, it would often be far more unfair to permit longstanding paternity judgments to be altered in such a manner as to leave children fatherless and without financial support. Alleged fathers in paternity proceedings have an opportunity to litigate the issue. If they wish to take advantage of that opportunity, they must do so at the time the judgment is rendered, or they must bring challenges to such judgments within the reasonable time limits set by C.R.C.P. 60(b)  not years later and in contravention of settled expectations.
In this case, R.L.C. had every opportunity to present a defense in court at the time that the issue of paternity was litigated, in 1988.[10] He could have demanded a blood test and a full trial, where he could have presented evidence and cross-examined witnesses. He chose not to. He may not now, more than eleven years after the judgment entered, attempt to reopen the judgment and litigate the issue of paternity. His time for asserting a C.R.C.P. 60(b) motion for relief from the judgment on the basis of mistake of material fact has long since expired.

B. Colorado Statutes Do Not Provide For Post-Adjudication Genetic Tests to Determine Biological Parentage
Next, we turn to the question of whether a court is required to order genetic testing to determine the biological parentage of a child after a judgment of paternity has entered. R.L.C. argued to the court of appeals that the statute governing genetic testing, section 19-4-112, does not contain a time limit.
The section of the Children's Code, section 19-4-112, entitled "Genetic or other tests," on which R.L.C. bases his argument, superficially suggests that such tests are available at any time. A closer reading, however, reveals that this is not the case. Section 19-4-112 depends on another statute, section 13-25-126, 5 C.R.S. (2001), to define the precise circumstances in which such tests are available and the procedures to be followed when conducting such tests. In relevant portion, section 19-4-112 states:
Upon motion of the court or any of the interested parties, genetic tests or other tests of inherited characteristics shall be ordered and the results received in evidence, as provided in section 13-25-126, C.R.S.

(Emphasis added.) The language of section 13-25-126, to which section 19-4-112 refers, *334 indicates that genetic tests are available only before a determination of paternity has occurred:

In any action, suit or proceeding in which the parentage of any child is at issue, upon motion of the court or any of the interested parties, the court shall order the alleged mother, the child or children, and the alleged father to submit to genetic testing and other appropriate testing . . . for the purpose of determining probability of parentage.

§ 13-25-126(1)(a) (emphasis added).
Thus, under section 13-25-126, it is only when there is an "alleged" father that genetic tests are required. The statute is wholly inapplicable when there has already been an adjudication of paternity  when paternity has already been determined. In such a situation, it is no longer necessary for the court to determine "probability of parentage" because that determination has already been conclusively made.
In this case, R.L.C. is not the "alleged father"; he is the legal father, having been adjudged so. Hence, he cannot now obtain the genetic tests that he seeks. The trial court acted appropriately in denying his motion.
We note that this result is consistent with our conclusion that R.L.C. cannot now, eleven years after a judgment of paternity entered, challenge that judgment on the basis of mistake of material fact. It would be meaningless to require the genetic test when its results could not be used to challenge the judgment.
With this case, we reiterate that a legal finding of paternity entails more than simply an analysis of DNA test results. N.A.H., 9 P.3d at 359 ("Parentage in our complex society comprises much more than biological ties . . . ."); Ince v. Ince, 58 S.W.3d 187 (Tex. App.2001) ("Being a parent has always meant more than simply proving [that] the DNA necessary to create human life originated from a particular individual. . . . The judgment at issue in this case should not be set aside because one of the individuals involved has become unhappy with the continued existence of it. More should be required to terminate the parent-child relationship than simply establishing that the individual is not the biological parent."). Instead, as mentioned above, paternity determinations are made based on the best interests of the child. N.A.H., 9 P.3d at 364. It cannot seriously be contended that it would be in the best interests of J.A.U. to now conduct genetic testing that might reveal that the person that she believed to be her father is not her father and that would deprive her of financial support, particularly when no contention has been made as to who else might be J.A.U.'s father.
Our holding, that R.L.C. is not entitled to post-adjudication genetic or blood tests to be used to challenge the judgment of paternity, is consistent with the result reached by many jurisdictions that have considered this issue.[11]See, e.g., City & County of San Francisco v. Cartagena, 35 Cal.App.4th 1061, 41 Cal.Rptr.2d 797 (1995); De Weese v. Unick, 102 Cal.App.3d 100, 162 Cal.Rptr. 259 (1980); Schaffer v. Overby, 613 So.2d 128 (Fl.Dist.Ct. App.1993); Clay v. Clay, 397 N.W.2d 571 (Minn.App.1986); Watts v. Watts, 115 N.H. 186, 337 A.2d 350 (1975); Withrow v. Webb, 53 N.C.App. 67, 280 S.E.2d 22 (1981); Wachter v. Ascero, 379 Pa.Super. 618, 550 A.2d 1019 (1988); In re L.S.G., 170 Wis.2d 231, 487 N.W.2d 644 (App.1992). Like us, these jurisdictions have recognized a policy in favor of protecting children from belated resort to scientific proof as part of efforts to escape parental responsibility.

IV. CONCLUSION
For the reasons discussed above, the judgment of the court of appeals is reversed and this case is remanded to it for return to the *335 district court for further proceedings consistent with this opinion.
NOTES
[1] This was an issue that the trial court did not consider because the trial court did not interpret R.L.C.'s motion for genetic testing to be a motion for relief from the paternity judgment. The trial court limited its order to consideration of the relief that R.L.C. specifically sought through his motion: genetic testing.
[2] The precise questions upon which we granted certiorari are:

Whether the time limits of Rule 60(b) of the Colorado Rules of Civil Procedure apply when a legal finding of paternity is challenged on the basis of mistake of fact.
Whether C.R.S. § 19-4-112, when read in its entirety mandates an order for genetic testing at any time in a paternity proceeding, including after a legal adjudication of paternity has been entered.
[3] After the court of appeals issued its opinion, the parties voluntarily submitted to genetic testing. These tests revealed a 99.99% probability that R.L.C. is the biological father of J.A.U. Thus, R.L.C. did not submit briefs to this court. Nevertheless, we choose to address the issues raised, relying on the briefs submitted by R.L.C. to the court of appeals, because of their public importance. See, e.g., Bd. of County Comm'rs of the County of Arapahoe v. Crystal Creek Home-owners' Ass'n, 14 P.3d 325, 345 (Colo.2000).
[4] At the outset, we emphasize that our analysis in this case is limited to the questions upon which we have granted certiorari. We assume, for the purposes of this opinion and without considering these issues, that R.L.C.'s motion alleges that the paternity judgment was based on a mistake of material fact, as the court of appeals concluded, and that a man's erroneous assumption that he is the biological father of a particular child is the sort "mistake" that can justify relief from a judgment of paternity. We note, however, that there is some authority to the contrary on both questions. See, e.g., Cashner v. Freedom Stores, Inc., 98 F.3d 572, 576-77 (10th Cir.1996) (stating that relief under Fed.R.Civ.P. 60(b) is available only if the mistake which forms the basis for the motion is an excusable litigation mistake and not a deliberate action); Tandra S. v. Tyrone W., 336 Md. 303, 648 A.2d 439, 446 (1994) (stating that "mistake" means jurisdictional error and not unilateral error of judgment); Butler v. Brownlee, 152 Mont. 453, 451 P.2d 836, 839 (1969) (nothing that the trial court exceeded its jurisdiction in reopening the issue of paternity when the movant's motion did not, on its face, purport to seek such relief).
[5] C.R.C.P. 59 pertains to motions for post-trial relief. These must generally be brought within fifteen days of entry of the judgment, and so are not relevant to this case. C.R.C.P. 60(a) pertains to clerical mistakes and is also not relevant here.
[6] We reiterate that the granting of relief pursuant to C.R.C.P. 60(b) rests within the sound discretion of the trial court. See, e.g., Davidson, 16 P.3d at 238; State Farm Mut. Auto. Ins. Co. v. McMillan, 925 P.2d 785, 790 (Colo.1996); E.B. Jones Constr. Co. v. City & County of Denver, 717 P.2d 1009, 1013-14 (Colo.App.1986). An appeal from the denial of a motion for 60(b) relief raises only the question of whether the trial court abused its discretion and does not bring up the underlying judgment for review. 717 P.2d at 1014.
[7] In total, C.R.C.P. 60(b) provides ten reasons, divided into five categories, that a party may use to challenge a judgment: (1) mistake, inadvertence, surprise, or excusable neglect; (2) fraud; (3) the judgment is void; (4) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it was based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; and (5) any other reason justifying relief from operation of the judgment. C.R.C.P. 60(b). Different time limits apply depending on the category. Id.
[8] We have previously held that C.R.C.P. 60(b) does apply to paternity judgments. Peercy v. Peercy, 154 Colo. 575, 579, 392 P.2d 609, 611 (1964). However, Peercy was decided before current Colorado paternity statutes, including section 19-4-105(2)(c), were adopted and so is not dispositive here.
[9] With section 19-4-105(2)(c), the legislature codified the right to attack final adjudications of paternity for three specific reasons. We take no position on whether the legislature intended to prohibit other sorts of challenges, normally permitted under C.R.C.P. 60(b), since the basis for the challenge in this case, "mistake," is certainly available under both C.R.C.P. 60(b) and section 19-4-105(2)(c).
[10] R.L.C. appeared pro se before the trial court. This fact does not affect our conclusions since he could have obtained legal counsel. A tactical error made because a party did not have an attorney is not ordinarily grounds for relief from a judgment. Viles v. Scofield, 128 Colo. 185, 187, 261 P.2d 148, 149 (1953).
[11] A few states have adopted statutes that specifically permit courts to order genetic testing and use the results of those tests to set aside existing paternity judgments. See, e.g., Ala.Code § 26-17A-1(a) (2001); Ark. Code Ann. § 9-10-115(c)(1) (Michie 2001); 750 Ill. Comp. Stat. § 45/7(b-5) (2001); Md.Code Ann., Fam. Law § 5-1038(a)(2)(i)(2) (2001). However, those states often provide that such tests can only be obtained, and such challenges made, within a definite time period after the adjudication. Ark. Code Ann. § 9-10-115(c)(2) (Michie 2001) (five year limit); 750 Ill. Comp.Stat. § 45/8(4-a) (2001) (two year limit).